IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

ROBBIN AMANDA BAYSE, a/k/a          )
ROBERT BAYSE,                       )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          CV 122-024
                                    )
TED PHILBIN, et al.,                )
                                    )
            Defendants.             )

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

_____

Plaintiff, an inmate at Baldwin State Prison, is proceeding *pro se* and *in forma pauperis* ("IFP") in this case brought pursuant to 42 U.S.C. § 1983, concerning events at Augusta State Medical Prison ("ASMP") in Grovetown, Georgia.  For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motion for summary judgment be **DENIED**, (doc. no. 87), the motion for summary judgment by Defendants Clements, Davis, and Young (collectively "Mental Health Defendants") be **DENIED**, (doc. no. 93), and the motion for summary judgment by Defendants Gaines, Harvey, Philbin, Shelton, and Smith (collectively "Prison Official Defendants") be **DENIED** as to Defendants Philbin, Shelton, and Harvey, and **GRANTED** as to Defendants Gaines and Smith, (doc. no. 102).

**I.     PROCEDURAL BACKGROUND**

After an initial screening and motions to dismiss, what remains at the summary judgment stage are deliberate indifference claims against Defendants in their individual capacities concerning Plaintiff's treatment at ASMP for gender dysphoria.  The Clerk has issued the

appropriate summary judgment notices and warnings in compliance with Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (*per curiam*).  Plaintiff neither filed a Statement of Material Facts supporting her motion nor responded to those filed by Defendants supporting their motions.  Much of Plaintiff's brief consists of "unsupported, conclusory allegations that [she] suffered a constitutionally cognizant injury," which "are insufficient to withstand a motion for summary judgment," Howard v. Memnon, 572 F. App'x 692, 695 (11th Cir. 2014) (*per curiam*) (citing Bennett v. Parker, 898 F.2d 1530, 1532-34 (11th Cir. 1990)). Where Plaintiff failed to properly dispute a material fact,[1] the Court deems admitted all portions of Defendants' Statements of Material Facts having evidentiary support in, and not otherwise contradicted by, the record.  See Fed. R. Civ. P. 56; Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (*per curiam*); Scoggins v. Arrow Trucking Co., 92 F.Supp.2d 1372, 1373 n.1 (S.D. Ga. 2000).

Such deficiencies do not result in an automatic grant of summary judgment to Defendants.  Instead, each movant continues to "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).  Moreover, the Court is mindful it "must construe the facts and draw all inferences in the light most favorable to the nonmoving party and 'when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.'" Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (quoting Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir.

---

[1] A party disputing a fact must cite "to particular parts of materials in the record," and an affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(1) & (4).

2005)).  Thus, the Court has reviewed the entire record, including Plaintiff's deposition, "to determine if there is, indeed, no genuine issue of material fact."  Mann, 588 F.3d at 1303.

## II.    FACTUAL BACKGROUND

Plaintiff has been incarcerated at various Georgia Department of Corrections ("GDC") facilities continuously since 1998, (see Bayse Dep., pp. 12, 16-17, 19-20), and was first diagnosed with gender dysphoria in 2015 at Rutledge State Prison, (doc. no. 87, p. 2; doc. no. 95, p. 11; doc. no. 102-1, p. 1; Bayse Dep., p. 17).  GDC medical staff have routinely admitted Plaintiff to crisis stabilization units at these facilities for alarming acts such as threatening to cut off her testicles, attempted and actual genital mutilation, recurrent thoughts of self-harm and suicide, and a hanging attempt.  (See, e.g., doc. no. 102-9, pp. 67, 75, 77, 82-83, 87, 127; doc. no. 102-12, pp. 139, 147, 150; doc. no. 102-13, p. 11.)

Plaintiff was imprisoned at Georgia State Prison ("GSP") from May 2019 to January 2020.  (Doc. no. 102-1, p. 1; Bayse Dep., p. 19.)  While imprisoned at GSP, medical staff issued a mental health treatment plan in October 2019, listing gender dysphoria as Plaintiff's principal diagnosis and borderline personality disorder as an "other diagnosis."  (Doc. no. 1-2, "GSP Plan," p. 1; see also doc. no. 87, p. 3; doc. no. 95, pp. 2-3; doc. no. 102-1, pp. 2-3.)  The GSP Plan aimed to treat Plaintiff's depressive symptoms as they related to her gender dysphoria, including thoughts of self-harm and suicide, and the intervention strategy to achieve this goal stated as follows:

> Client will continue to utilize hormone therapy to affirm her female identity, and will continue to advocate for appropriate trans gender medical care as needed.  Client will also affirm her gender through utilizing she/her/hers pronouns and female titles such as Miss or Ms.  Client will continue to wear female undergarments and will follow grooming and cosmetic standards consistent with those of other women incarcerated by the Georgia Department of Corrections; she has the end goal of receiving gender affirming surgery.

Client will participate in weekly SLU community meetings, twice monthly individual therapy sessions with [Mental Health Counselor ("MHC")], and will utilize activity therapy and MHC rounds on business days as needed.

MHC will utilize gender affirming language and will advocate for Ms. Bayse through education and training of other GDC employees.   MHC will also advocate for Ms. Bayse through case management related to hormone treatment, and through consistent efforts to expand institutional practices that affirm the client's female identity, as is pertinent to the treatment of gender dysphoria.

(GSP Plan, p. 2.)

Plaintiff transferred to ASMP in January 2020.  (Doc no. 87, p. 3; doc. no. 95, p. 12; doc. no. 102-1, p. 1.)   For the first six months, Plaintiff continued to receive treatment according to the GSP Plan including hormone therapy, regular counseling, and permission to "follow grooming and cosmetic standards consistent with those of other women incarcerated by the [DOC]."  (See Bayse Dep., pp. 16, 19, 28-31; doc. no. 95, pp. 5-6; doc. no. 102-1, pp. 2.)  However, ASMP officials routinely informed Plaintiff the GSP Plan violated GDC policy.  (Bayse Dep., pp. 28-31; doc. no. 95, p. 5).

At an unspecified time in 2020, ASMP issued a new mental health treatment plan for Plaintiff.  (Doc. no. 94-1, pp. 11-12, "ASMP Plan.")  Interestingly and somewhat confusingly, the only treatment plan from ASMP in the summary judgment record bears a date of February 22, 2022.  (See id.; see also doc. no. 55-2, pp. 165-66; doc. no. 89, pp. 38-39.)  Consistent with the parties' treatment of the issue, however, the Court will make no distinction between the two, such that reference to the ASMP Plan will mean the plan implemented in 2020 but apparently not reduced to writing until 2022.

The ASMP Plan lists Plaintiff's primary diagnosis as borderline personality disorder, with an additional diagnosis of gender dysphoria.  (ASMP Plan, p. 11.)  This is the opposite of the GSP Plan, which listed gender dysphoria as the primary diagnosis and borderline

personality disorder as the "other" diagnosis.  (GSP Plan, p. 1.)  The ASMP Plan provides as

follows:

> Principal Diagnosis: Borderline Personality Disorder
> Other Diagnoses: Gender Dysphoria
>
> If diagnosis includes Gender Dysphoria, an intervention is <u>required</u> referring offender to medical for determination of need for endocrinology services.
> . . . .
>
> Problem #: 1          Problem Description: Offender Bayse reports target symptoms of depression and anxiety 7 out of 7 days/week.
>
> Goal: [X] Maintenance          [ ] Change
> Goal Description:
>          Reduce symptoms of recurrent depressive episodes and anxiety to 5 out of 7 days/week.
>          Offender will have no CSU admissions or DR's during the next six (6) months.
>          Offender will remain medication compliant for the next 6 months.
> . . . .
>
> Intervention Strategy (Include strengths and weaknesses that impact treatment, actions to be taken, frequency of sessions, and persons responsible- include referral to medical if indicated):
>
>          l.       Offender will learn and apply at least 3 coping skills to decrease depressive episodes.
>          2.       Offender will meet with mental health counselor l x a month to for [sic] individual counseling and utilizing positive thinking along with cognitive reframing thought stopping & positive reinforcement.
>          3.       Offender will meet 2 x per week for suicide precautions and see psychiatry every 60 days.
>          4.       The offender will attend the scheduled psychiatric appts. to determine the efficacy of the prescribed antipsychotic and anti[illegible] in target [sic] symptoms of depression and anxiety.
> . . . .
>
> Problem #: 2          Problem Description: Offender Bayse reports [suicidal ideation] 7 out of 7 days per week due to Gender Dysphoria.
>
> Goal: [ ] Maintenance          [X] Change
> Goal Description: Offender Bayse will decrease suicidal ideations to 2 out of 7 days per week.
> . . . .

Intervention Strategy . . . :

     1.      Offender will meet with mental health counselor 2 x a week for SP/monthly for individual counseling.

     2.      Offender will practice calming/relaxation skills and learn how to apply these skills to offender daily life.

(ASMP Plan, p. 12.)  Someone with the initials "SC" modified the original text by striking "self-injurious behaviors" throughout and replacing with "suicidal ideations."  (See id.) Plaintiff continued to receive hormone replacement therapy during her entire period of incarceration at ASMP even though the ASMP Plan, unlike the GSP Plan, does not list such therapy as a form of treatment.  (See id. at 11-12; doc. no. 102-1, p. 2; Bayse Dep., pp. 14, 18.)

Plaintiff contends Defendants created the ASMP Plan "for reasons other than medical." (Doc. no. 87, pp. 3-4.)  The Mental Health Defendants explain it is ASMP policy to evaluate and issue a new treatment plan for every transferred inmate.  (Doc. no. 95, p. 2.)  Plaintiff's chief complaint with the ASMP Plan is its failure to continue the social transitioning accommodations provided in the GSP Plan, which allowed her to wear female undergarments and follow GDC grooming and cosmetic standards for females.  (See GSP Plan, p. 2.)  Her dissatisfaction led to the filing of a grievance in June 2020, accusing Defendant Harvey, Deputy Warden of Security, of yelling at her that she needed to get a haircut, which allegedly made her feel "severely depressed and dysphoric, and thoughts of self-harm, auto-castration, and suicide occurred."  (Doc. no. 55-2, p. 197; see also doc. no. 94-2, p. 17; doc. no. 95, p. 5.)

Defendant Young, Director of the Mental Health Unit at ASMP, met with Plaintiff on June 8, 2020, to discuss her grievance.  (Doc. no. 95, p. 5.)  According to Defendant Young's notes, Plaintiff explained her belief that social transitioning accommodations like longer hair and makeup were appropriate for her diagnosis.  (Doc. no. 94-2, p. 17.)  Defendant Young noted she responded by reading aloud a portion of GDC Standard Operating Procedure

507.04.68:  "If a diagnosis of Gender Dysphoria is reached, a treatment plan will be developed that promotes the physical and mental health of the patient.  The development of the treatment plan is not solely dependent on services provided or the offender's life experiences prior to incarceration."  (Id.; see also doc. no. 1-5, "GDC SOP 507.")  According to Defendant Young, Plaintiff "began to get loud" and stated, "you better not mess with my f[***]ing hair."  (Doc. no. 94-2, p. 17.)  Defendant Young informed Plaintiff "aggressive behavior is unacceptable," and Plaintiff stated "that b[****] better not touch my hair" as she left Defendant Young's office.  (Id.)

Four days later, on June 12, 2020, Plaintiff met with a number of ASMP staff including Defendants Philbin, Shelton, Harvey, and Young.  (Doc. no. 102-4, "Philbin Decl.," p. 3; see also doc. no. 87, p. 7; doc. no. 95, p. 6.)  Defendant Philbin, ASMP Warden, called the meeting to discuss the continuing disagreement with Plaintiff concerning the ASMP Plan.  (Philbin Decl., p. 3.)  Defendant Young's contemporaneous notes recount efforts by Defendants Philbin and Young to reason with Plaintiff, who was allegedly combative and disrespectful.  (Doc. no. 94-2, p. 16.)  Defendant Philbin explained he wanted to help Plaintiff but only within the bounds of GDC policy.  (Id.)  Defendant Young again read the excerpt above from GDC SOP 507.  (Id.)  Plaintiff warned the attendees she would harm herself if forced to get a male haircut. (Id.)  She responded to Defendant Young's reading of the SOP by declaring she "did not know what [he] was talking about."  (Id.)

Plaintiff's description of the meeting is similar.  She recalls talking "about her gender dysphoria diagnosis, her depression, anxiety, sad moods[], and thoughts of self-harm and suicide," as well as "[t]hat she had engaged in self-harm, self-castration, and suicide attempts because of the lack of treatment for her gender dysphoria."  (Doc. no. 87, p. 7.)  She also shared

in the meeting "her [GSP Plan] was starting to work until her transfer to ASMP." (Id.) Plaintiff recalls Defendant Philbin telling her the GSP Plan was against policy, (id.; see also Bayse Dep., pp. 29, 33), which Defendant Philbin denies, (Philbin Decl., p. 3).

Plaintiff also contends Defendant Philbin told her she "was not born a female, that [Plaintiff] was born with a penis and that if [Plaintiff] was a female, then [Plaintiff] would not be in a male prison. But [Plaintiff] was born with a penis and [is] a male and [Plaintiff] will never see the inside of a female prison." (Bayse Dep., p. 35.) Plaintiff also recalls Defendant Harvey stating Plaintiff had to cut her hair and take off her makeup, nail polish, and earrings, and telling Plaintiff, "Bayse, you have a d[***] between your legs. You're a male and not a female." (Id. at 33-34.) Plaintiff further recounts Defendant Shelton, Deputy Warden of Care and Treatment, saying "the treatment plan that [Plaintiff was] to follow will be treating [Plaintiff's] anxiety and depression with medication and that [Plaintiff] would no longer be able to do what [she had] been doing." (Id. at 34.) All three defendants deny these allegations. (Philbin Decl., pp. 3-4; doc. no. 102-5, p. 3; doc. no. 102-6, p. 3.)

On June 24, 2020, Plaintiff met with psychiatrist Dr. Rasheed, who attempted to prepare Plaintiff for the inevitable event of getting a haircut. (Doc. no. 89, p. 69.) Plaintiff became upset and left after ten minutes. (Id.) Dr. Rasheed's notes from the session warn Plaintiff would need to be restrained during a haircut and thereafter placed on suicide precautions. (Id.)

On March 3, 2021, Defendant Harvey ordered Defendant Gaines to cut Plaintiff's hair because it "exceeded the allowable length according to GDC [SOPs]." (Doc. no. 102-7, "Gaines Decl.," p. 3.) Plaintiff was then called to the location where haircuts are provided at ASMP and ordered to get a haircut. (Doc. no. 87, p. 8.) According to the incident reports, Defendant Smith and Officer Cordero Campbell assisted Defendant Gaines with the haircut.

(Doc. no. 89, pp. 41-42; Gaines Decl., p. 3.)  Plaintiff presented the GSP Plan to Defendants Gaines and Smith but neither of them read it or listened when she attempted to read it.  (Doc. no. 87, p. 8; Gaines Decl., p. 3; doc. no. 102-8, "Smith Decl.," p. 2.)  Defendant Gaines told Plaintiff "she was a male in a male facility and that she would get her hair cut to the male standards."  (Doc. no. 87, p. 8; Gaines Decl., p. 3.)

Plaintiff claims Defendant Smith and Officer Campbell grabbed her by the arms, forced her into the barber's chair, and held her down while the barber, a fellow inmate, cut Plaintiff's hair.  (Bayse Dep., p. 46; doc. no. 87, p. 8.)  Plaintiff alleges she "pleaded and begged for them to stop" throughout the haircut.  (Doc. no. 87, p. 8.)  Defendants Gaines and Smith deny using force during the haircut.  (Gaines Decl., p. 3; Smith Decl., p. 2.)  The incident report, however, states Defendant Smith and Officer Campbell used "hands-on" force.  (Doc. no. 89, p. 41.)  Two "Use of Force Supplement Reports" completed by Defendant Smith and Officer Campbell state they both "used [their] right and left hand to assist" with taking pictures of Plaintiff, Plaintiff's haircut, and her subsequent escort following the haircut.  (Id. at 47-48.)

Plaintiff "refused to provide a statement regarding the incident."  (Id. at 65.)  After the haircut, Defendant Smith and Officer Campbell escorted Plaintiff to the crisis stabilization unit, where Plaintiff remained under observation for two days.  (Doc. no. 55-2, p. 74; doc. no. 87, p. 8; doc. no. 89, p. 42.)  Plaintiff attempted self-castration three days after being released from this unit, on March 8, 2021.  (Doc. no. 111, p. 25.)

As the factual summary *supra* reflects, Defendants repeatedly informed Plaintiff that GDC policy prohibited the social transitioning accommodations in the GSP Plan.  (See, e.g., doc. no. 87, p. 7; doc. no. 94-2, pp. 16-17; Bayse Dep., pp. 29, 33.)  While Defendants occasionally cited GDC SOP 507 when communicating this to Plaintiff, they also referred

generally to "GDC policy," as they do now in their summary judgment filings.  (Compare, e.g., doc. no. 94-2, pp. 16-17, with doc. no. 87, p. 7, and doc. no. 95, p. 5.)  This same claim that GDC SOPs prohibit social transitioning now serves as the linchpin of Defendants' summary judgment motions.  (See doc. nos. 94, 95, 102.)  However, despite the importance of GDC policy to Defendants' arguments, they do not provide any GDC policy or SOP for the Court's consideration with their summary judgment motions.  (See doc. nos. 94, 95, 102.)  In fact, Plaintiff provided the only copy of GDC SOP 507 in the record, as an attachment to the Complaint, and it appears to be only page one of two pages.  (See doc. no. 1-5.)

In addition, Defendants make no attempt to clarify whether the partial GDC SOP 507 provided by Plaintiff was the operative version of the policy while Plaintiff was housed at ASMP.  The version provided by Plaintiff bears an effective date of April 7, 2015.  (Id.)  No party has provided a later promulgated or complete version of GDC SOP 507 for the Court's consideration.  Because the current SOP post-dates the relevant time period, the Court has only the partial version of GDC SOP 507 provided by Plaintiff to consider at summary judgment. See GDC SOP 507, Management and Treatment of Transgender Offenders, Ga. Dep't of Corr. (Feb. 1, 2022), https://public.powerdms.com/GADOC/documents/106405 (bearing effective date of February 1, 2022).  Moreover, GDC SOP 507 has undergone significant changes since the 2015 version submitted by Plaintiff was promulgated.  See id. (reflecting current policy is seven pages long).

The "Statement of Policy and Applicable Procedures" contained in the 2015 version of GDC SOP 507, which Plaintiff attached to the Complaint, provides as follows:

> Offenders with a possible diagnosis of Gender Dysphoria, including offenders who assert they have Gender Dysphoria, will receive thorough medical and mental health evaluations from appropriately licensed and qualified medical and

mental health professionals.  The evaluation will include an assessment of the offender's treatment and life experiences prior to incarceration as well as experiences during incarceration (including hormone therapy, completed or in-process surgical interventions, real life experience consistent with the offender's gender identity, private expressions that conform to the preferred gender and counseling).

If a diagnosis of Gender Dysphoria is reached, a treatment plan will be developed that promotes the physical and mental health of the patient.  The development of the treatment plan is not solely dependent on services provided or the offender's life experiences prior to incarceration.  Treatment plans will be reviewed regularly and updated as necessary.  Current, accepted standards of care will be used as a reference for developing the treatment plan.

GDC SOP 507.

## III.   DISCUSSION

Plaintiff alleges Defendants were deliberately indifferent to her serious medical needs by omitting social transitioning accommodations from the ASMP Plan.  (See doc. no. 87.)  The Mental Health Defendants argue GDC SOPs prohibited such accommodations, they are not medically necessary, and the absence of them did not cause any injury to Plaintiff.  (See doc. no. 94.)   The Prison Official Defendants contend they had no involvement in Plaintiff's treatment plan, Plaintiff's treatment was constitutionally sufficient, there is no basis for supervisory liability, and, in the alternative, they are entitled to qualified immunity.  (See doc. no. 102-2.)

Plaintiff is not entitled to summary judgment because her motion fails to comply with Local Rule 56.1, and it fails to prove as undisputed fact that social transitioning accommodations were medically necessary to treat her gender dysphoria.  The Mental Health Defendants, as well as Defendants Philbin, Harvey, and Shelton, are not entitled to summary judgment because reasonable jurors could find their proffered reason for denying Plaintiff social transitioning accommodations is pretextual, and reasonable jurors could disagree

concerning whether such accommodations were medically necessary.  Defendants Gaines and Smith are entitled to summary judgment because they merely obeyed orders to cut Plaintiff's hair and had no involvement in determining whether Plaintiff should receive social transitioning accommodations.

### A.     Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross,

663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Federal Rule of Civil Procedure 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

### B.   Plaintiff Is Not Entitled to Summary Judgment Because She Failed to Comply with Local Rule 56.1 and Has Not Established Medical Necessity

Plaintiff's motion for summary judgment should be denied for two reasons.  First, in contravention of Local Rule 56.1, there is no separate statement of undisputed material facts. A motion may be summarily denied for failure to comply with the Court's Local Rules.  See, e.g., Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979)[2] (holding failure to comply with the Local Rules may result in summary denial of motion).

Second, Plaintiff has failed to show "on all the essential elements of [her] case . . . , no reasonable jury could find for" Defendants.  Four Parcels of Real Prop., 941 F.2d at 1438.  To prevail on a claim for deliberate indifference to a serious medical need, Plaintiff must prove (1) she had a serious medical need—the objective component, (2) a defendant acted with deliberate indifference to that need—the subjective component, and (3) her injury was caused by a defendant's wrongful conduct.  Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007); see also Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010).

Focusing on the second element, and construing all evidence most favorably to the

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

defense, reasonable jurors could disagree concerning whether Defendants—with the exception of Defendants Gaines and Smith, who, as explained further *infra*, are entitled to summary judgment in their favor—acted with deliberate indifference.  To determine whether denial of a particular form of treatment demonstrates deliberate indifference, the question is "whether the particular types of treatment [an inmate] has requested are medically necessary, such that any course of care that doesn't include them would be constitutionally inadequate." Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020), *cert. denied sub nom.*, Keohane v. Inch, 142 S. Ct. 81 (2021).

Far from proving that social transitioning accommodations were indisputably necessary to treat her gender dysphoria, Plaintiff has failed to submit any evidence of medical necessity.  The GSP Plan does not constitute evidence of medical necessity because mere inclusion of a particular treatment in a plan does not, by itself, establish medical necessity because a treatment might be, for example, ideal or psychologically pleasing but not medically necessary. Keohane, 952 F.3d at 1274.  Furthermore, the Standards of Care promulgated by the World Professional Association for Transgender Care ("WPATH"), which Plaintiff trumpets, are merely "flexible clinical guidelines" and list "changes in gender expression and role" as an "option" for treating gender dysphoria.  (See doc. no. 119, pp. 8, 15); see also Edmo v. Corizon, Inc., 935 F.3d 757, 769 (9th Cir. 2019) ("Treatment under the WPATH Standards of Care must be individualized.").  For these reasons, Plaintiff failed to show no reasonable juror could find social transitioning accommodations were not medically necessary.  Keohane, 952 F.3d at 1274; see also Gibson v. Collier, 920 F.3d 212, 221-24 (5th Cir. 2019); Kosilek v. Spencer, 774 F.3d 63, 78 (1st Cir. 2014).

**C.** **Defendants Philbin, Harvey, and Shelton, and the Mental Health Defendants Are Not Entitled to Summary Judgment Because Interpreting GDC SOP 507 as a Blanket Ban Is Incorrect and Pretextual**

Defendants, with the exception of Defendants Gaines and Smith, are not entitled to summary judgment because they have failed to establish an adequate and convincing record of undisputed facts. Defendants' primary argument is that GDC SOPs prohibit social transitioning accommodations, which appears to be incorrect. When they do raise the absence of medical necessity as a secondary argument, the supporting factual record is inadequate to grant summary judgment in their favor.

**1.** **Reasonable Jurors Could Find Defendants' Position that GDC SOP 507 Precludes Accommodations Is Pretextual**

Defendants' leading summary judgment argument is they could not have provided social transitioning accommodations to Plaintiff because GDP SOP 507 prohibits such accommodations for inmates diagnosed with gender dysphoria. The argument is not a post-hoc rationalization. On the contrary, Defendants repeatedly cited this SOP to Plaintiff in 2020 as the reason they could not continue the social transitioning accommodations in the GSP Plan. (doc. no. 94-1, "Clements Decl.," p. 3; doc. no. 94-2, "Young Decl.," p. 3; doc. no. 94-3, "Davis Decl.," p. 3; Philbin Decl., p. 3). Surprisingly, however, Defendants never bother to provide the Court with any version of GDP SOP 507 or any other GDC SOP addressing gender dysphoria treatment or grooming and cosmetic standards at GDC facilities. While the version of GDC SOP 507 Plaintiff attached to the Complaint appears to be the version that was effective in 2020, it is missing one of two pages.

In addition, despite serious effort, the Court cannot conjure any reading of this version of GDC SOP 507 that prohibits social transitioning accommodations for inmates suffering

from gender dysphoria.  In particular, the excerpt from this SOP that Defendants repeatedly read aloud to Plaintiff contains no such prohibition.  If anything, GDC SOP 507 promotes careful implementation of a comprehensive treatment plan with no blanket prohibitions, as well it should because a blanket ban on a particular form of treatment for transgender inmates would likely be unconstitutional on its face.  See Keohane, 952 F.3d at 1267 ("Unsurprisingly to us, other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment.").

Furthermore, with little effort, the Court found several other GDC SOPs, never mentioned by Defendants, bearing an effective date preceding Plaintiff's arrival at ASMP that explicitly provide social transitioning accommodations for inmates diagnosed with gender dysphoria.[3]  Finally, although the Court will not rely on this observation to deny summary judgment, it is worth noting that GSP officials must have determined GDC SOPs in effect at the time did not prohibit social transitioning accommodations because they included such accommodations in the GSP Plan for Plaintiff.

On this record, the Court cannot grant summary judgment to any Defendant on the basis that GDC SOP 507 prohibited Defendants from continuing the social transitioning accommodations ordered by Plaintiff's mental health providers at GSP because reasonable

---

[3] See GDC SOP 206.01, attach. 1 (allowing transgender inmates at male facilities to receive bras); GDC SOP 206.04 (allowing transgender inmates to request hygiene items appropriate to their needs); GDC SOP 220.09 (permitting transgender offenders to receive hygiene and undergarments if no valid security concern); GDC SOP 220.09, p. 17 (requiring provision of "individualized assessments and care" to include mental health services and hormone treatment); GDC SOP 220.09, attach. 2 (allowing inmate requests for undergarments and hygiene items "consistent with your gender identity.").    Access at https://gdc.georgia.gov; *follow* link for Policies & Procedures under "About GDC" menu; *click* relevant Division (last visited Feb. 20, 2024).

jurors could find this proffered reason for the discontinuation to be pretextual.

      **2.**      **Reasonable Jurors Could Find Defendants Failed to Establish Social Transitioning Accommodations Were Not Medically Necessary**

Because the factual record reasonably suggests Defendants' reliance on GDC SOP 507 was pretextual, the Mental Health Defendants' summary judgment motion is left hanging by one thread. Defendants Clements and Davis are two of an unspecified number of Mental Health Unit personnel involved in preparing Plaintiff's ASMP Plan—a treatment plan which, at least as presented to Plaintiff in 2020, is not part of the record. Clements and Davis both opine by affidavit that, regardless of the supposed blanket ban on social transitioning in GDC SOP 507, "these female grooming and cosmetic accommodations would not be appropriate or clinically indicated for Inmate Bayse and would not address the primary diagnosis of Borderline Personality Disorder." (Clements Decl., pp. 3-4; Davis Decl., p. 3.) Both offer this opinion without further explanation. Defendant Young, who is Director of the Mental Health Unit, entirely avoids the issue. (See Young Decl.) The Court cannot grant summary judgment based on this one sentence from the Clements and Davis declarations for at least two reasons.

First, immediately preceding this sentence is the unequivocal yet seemingly false statement by both Defendants Clements and Davis, also echoed by Defendant Young, that unspecified GDC SOPs prohibit social transitioning, and no one at ASMP has "the authority to order that any inmate, including Inmate Bayse, be excepted from GDC SOPs." (Clements Decl., p, 3; Davis Decl., p. 3; Young Decl., p. 3.) Because this false premise was the starting point for determining the ASMP Plan, reasonable jurors could find (1) the Mental Health Defendants never gave serious, if any, consideration to whether social transitioning was medically necessary for Plaintiff; and (2) offering the opinion now as a post-hoc rationalization

rings hollow.[4]

Second, this single sentence is rife with ambiguity and falls far short of establishing the Mental Health Defendants believed social transitioning was not medically necessary.  Both providers opine social transitioning (1) "would not be appropriate"; (2) is not "clinically indicated"; and (3) "would not address the primary diagnosis of Borderline Personality Disorder."  (Clements Decl., pp. 3-4; Davis Decl., p. 3.)  The terse opinion begs many questions.  Why is social transitioning "inappropriate" and what does "inappropriate" mean?  Why is social transitioning not "clinically indicated" for Plaintiff?  Would social transitioning address the secondary diagnosis of gender dysphoria?  Is social transitioning "clinically indicated" and, as more relevant here, medically necessary to treat Plaintiff's gender dysphoria?  Why offer this opinion without mentioning gender dysphoria?

The Prison Official Defendants advance a related argument, claiming "because Plaintiff received a course of treatment for her gender dysphoria condition[,] there is no constitutional violation."  (Doc. no. 102-2, p. 9.)  This argument conflates *some* treatment with constitutionally adequate treatment.  Providing an inmate with a panoply of treatments for a condition does not avoid liability when a particular treatment is medically necessary but not provided.  See Keohane, 952 F.3d at 1266–67; De'lonta v. Johnson, 708 F.3d 520, 526 (4th

---

[4] See Johnson v. Lewis, 83 F.4th 1319, 1328 (11th Cir. 2023) ("[T]hese justifications were only provided post-lawsuit.  No contemporaneous treatment documents or notes by [a treating physician] reflect these justifications.  And, even if these justifications are true, they do not necessarily negate a conclusion of medical necessity."); Kister v. Quality Corr. Health Care, No. 20-11537, 2022 WL 3018194, at *4 (11th Cir. July 29, 2022) (*per curiam*) (reversing summary judgment for jury to decide whether refusal to prescribe narcotics was independent medical judgment or acquiescence to jail "no narcotics" policy); Keohane, 952 F.3d at 1266-67 (explaining refusal to consider whether particular treatment is appropriate is "very definition of 'deliberate indifference'"); see also Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985); Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016) (explaining denial of necessary treatment for non-medical reason is intentional deprivation).

Cir. 2013) (explaining prisoners are not entitled to treatment of their choice but treatment "must nevertheless be adequate to address the prisoner's serious medical need"); Brooks v. Wilkinson Cnty., 393 F. Supp. 3d 1147, 1164 (M.D. Ga. 2019) (explaining "not just any treatment will do" because inmates are constitutionally entitled to care that is "adequate for their particular situation" (citing Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011))).

### 3. Reasonable Jurors Could Find Defendants Philbin, Harvey, and Shelton Interpreted GDC SOP 507 to Prohibit Plaintiff's Social Transitioning Accommodations

The Prison Official Defendants argue they are not healthcare providers and "had no role whatsoever in directing or providing medical or mental health care to Plaintiff." (Doc. no. 102-2, p. 8.)  However, denying social transitioning accommodations based on an insupportable interpretation of GDC SOP 507 is not a medical judgment.  Instead, it is the establishment of a custom, policy, or practice.  Although "[s]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability," liability may attach where a defendant actually participated in the alleged constitutional violation or where "the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (citations omitted).  The question left unanswered by the Prison Official Defendants is whether Defendants Philbin, Shelton, and Harvey were involved in the decision to adopt and enforce the incorrect interpretation of GDC SOP 507.  If they were, reasonable jurors could hold them liable.  See Truschke v. Chaney, No. 517-CV-093, 2018 WL 814579, at *5 (S.D. Ga. Feb. 9, 2018), *adopted by*, 2018 WL 1513354 (S.D. Ga. Mar. 27, 2018) (citation omitted) (explaining claim lies against non-medical prison officials who were personally involved in treatment denial or deliberately interfered with doctors' treatment).

19

Although not necessary to decide the present motions, the record contains evidence to suggest they were involved. During the meeting on June 12, 2020, Defendant Philbin explained he wanted to help Plaintiff but only within the bounds of GDC policy, and Defendant Young read aloud to Plaintiff the excerpt from GDC SOP 507 in the presence of Defendants Philbin, Shelton, and Harvey. (Doc. no. 94-2, p. 16.) Nine months later, Defendant Harvey ordered the haircut. (Gaines Decl., p. 3.)

Further suggestive of their involvement are their roles and responsibilities at ASMP. Defendant Philbin, as Warden, "was responsible for the overall management and operation of the prison." (Doc. no. 102-2, p. 3.) Defendant Shelton, as "Deputy Warden of Care and Treatment, . . . ensured that the day to day operations . . . was [sic] running safely *and according to standard operating procedures*." (Id. at 3 (emphasis added).) Defendant Harvey was Deputy Warden of Security and "when the Warden was not present she would act on the Warden's behalf with responsibility for the operation of the entire prison facility." (Id. at 4.)

### a. Defendants Philbin, Harvey, and Shelton Are Not Entitled to Qualified Immunity

The doctrine of qualified immunity protects government officials, acting pursuant to their discretionary authority, "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Townsend v. Jefferson County, 601 F.3d 1152, 1157 (11th Cir. 2010).

Here, because there is no question Defendants Philbin, Shelton, and Harvey were acting within the scope of their discretionary authority, Plaintiff must show "(1) the defendant

violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Townsend, 601 F.3d at 1158 (punctuation omitted) (quoting Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).

The first prong is satisfied here because, as explained *supra*, reasonable jurors could find Defendants violated Plaintiff's constitutional rights by denying her social transitioning accommodations. Turning to the second prong, "[a] right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent, and if a constitutional rule applies with obvious clarity to give an official fair warning that violating that right is actionable." Bennett v. Hendrix, 423 F.3d 1247, 1255 (11th Cir. 2005) (internal citations omitted). "If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity." Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003). In the Eleventh Circuit, "the law can be 'clearly established' for qualified immunity purposes only by decision of the United States Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997).

The issue here is whether the state of the law as of January 2020, when Plaintiff arrived at ASMP, gave Defendants fair warning that denial, discontinuation, or interference with medically necessary treatment for gender dysphoria constituted deliberate indifference. See id. at 741. In 2014, the Eleventh Circuit considered the denial of particular forms of treatment to a transgender inmate and reiterated "by 1986, it was well settled in this Circuit that intentionally refusing to provide medically necessary treatment constitutes deliberate indifference and violates the Eighth Amendment." Kothmann v. Rosario, 558 F. App'x 907, 912 (11th Cir. 2014) (*per curiam*) (citations omitted). The Kothmann court further reasoned:

"[T]he state of the law was sufficiently clear to put [Defendant] on notice that refusing to provide [the transgender plaintiff] with what she knew to be medically necessary hormone treatments was a violation of the Eighth Amendment."  Id. at 912.

In Diamond v. Owens, a case involving the denial of social transitioning accommodations, the court aptly described why the defendants there were not entitled to qualified immunity following Kothmann:

> [T]he law was sufficiently clear to give the Defendants fair warning that their refusal to provide [Plaintiff] with treatment they knew was medically necessary or to refer her for treatment violated [Plaintiff]'s Eighth Amendment right to adequate medical care.  And, as noted in Kothmann, binding precedent establishing that transgender inmates have a right to receive the specific treatment at issue—in this case, hormone therapy and female gender expression—is not required to overcome the Defendants' qualified immunity defense.

131 Supp. 3d 1346, 1375 (M.D. Ga. 2015).  Accordingly, the state of the law was sufficiently clear in 2020 to put Defendants on notice that denial of social transitioning accommodations to Plaintiff would constitute a violation of the Eighth Amendment.

Citing Keohane, Defendants argue, "[T]he law is not clearly established that a transgender inmate must receive the grooming and cosmetic accommodations that Plaintiff seeks."  (Doc. no. 102-2, p. 14.)  But the outcome in Keohane was based on the plaintiff's failure to establish medical necessity and the defendant's proof of an unambiguous and enforceable application of prison policy.  As discussed infra, Defendants failed to present an adequate factual foundation under Keohane.  Thus, the right clearly established by Kothmann and its progeny is an inmate's right to receive adequate treatment for their diagnosed gender dysphoria to the extent such treatment is medically necessary and does not interfere with a prison's genuine security concerns.  The state of the law was sufficiently clear in 2020 to put

Defendants on notice that denying or otherwise interfering with medically necessary social transitioning accommodations for Plaintiff's gender dysphoria would constitute a violation of the Eighth Amendment, and they are not entitled to qualified immunity.

### 4.   Defendants Failed to Develop the Factual Record <u>Keohane</u> Requires to Prevail on Summary Judgment

As Defendants repeatedly point out, the Eleventh Circuit's decision in <u>Keohane</u> provides a strong basis for granting summary judgment to prison officials in social transitioning cases, but Defendants failed here to establish the requisite factual foundation. Driving home the inadequacy of Defendants' summary judgment record is a comparison to the <u>Keohane</u> record, where "members of Keohane's medical-treatment team, Wexford's staff psychiatrist, the FDC's chief clinical officer, and the FDC's retained expert all testified" social transitioning was not medically necessary to treat Keohane's gender dysphoria.  <u>Keohane</u>, 952 F.3d at 1274.  The single-sentence opinion offered by Defendants Clements and Davis here does not compare, for reasons discussed in Section III(C)(2), *supra*.  Also, "Keohane's medical-treatment team further concluded that requiring Keohane to comply with the FDC's policies regarding hair and grooming standards doesn't put her at a substantial risk of self-harm or severe psychological pain."  <u>Id.</u>  No such opinion can be found in the record here.  In fact, Plaintiff has a history of self-harm that pre-dated any ASMP Plan, she repeatedly warned Defendants she would harm herself if they denied social transitioning and forced her to undergo a haircut, and shortly after the haircut she attempted castration.

Turning back to <u>Keohane</u>, "the FDC denied Keohane's social-transitioning-related requests, at least in part, on the ground that they presented serious security concerns—including, most obviously, that an inmate dressed and groomed as a female would inevitably

become a target for abuse in an all-male prison." 952 F.3d at 1275. Here, in contrast, no Defendant has offered evidence of security concerns. Notably, Plaintiff seemingly was allowed to continue social transitioning accommodations at ASMP from January 2020 to March 2021, and the record is devoid of evidence concerning inmate violence against her.

### D.   Defendants Gaines and Smith Are Entitled to Summary Judgment Because They Did Not Participate in Denying or Interfering with Treatment

There is no evidence in the record to suggest Defendants Gaines and Smith were involved in the decision to interpret GDC SOP 507 as a blanket prohibition on social transitioning accommodations at ASMP. Nor could a reasonable juror find they interfered in any way with Plaintiff's gender dysphoria treatment.

Plaintiff alleges Defendants Gaines and Smith were deliberately indifferent because they cut her hair on March 21, 2021. It is undisputed, however, that Plaintiff's ASMP Plan did not permit longer hair as an accommodation, Defendant Harvey ordered the haircut, and there is no evidence Defendants Gaines and Smith were subjectively aware the ASMP Plan was constitutionally inadequate. On these undisputed facts, no reasonable juror could find Defendants Gaines and Smith liable for deliberate indifference. See Calloway v. Dunn, No. 520-CV-807, 2021 WL 3388655, at *5 (N.D. Ala. July 8, 2021), *adopted by*, 2021 WL 3371041 (N.D. Ala. Aug. 3, 2021) (finding no deliberate indifference by officers who required inmate with gender dysphoria to undergo haircut despite her threats of suicide where treatment plan did not contain grooming accommodations); Kelly v. Ambroski, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015) ("[I]n the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference.").

Notably, after completing the haircut as ordered, Defendant Smith escorted Plaintiff immediately to the crisis stabilization unit for observation out of concern for her safety. (Doc. no. 89, p. 9.) This behavior is the antitheses of deliberate indifference. See Calloway, 2021 WL 3388655, at *5; cf. Greason v. Kemp, 891 F.2d 829, 835-36 (11th Cir. 1990) (finding deliberate indifference when officers know inmate is suicidal and take no preventative action); Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir. 1989) (same). Because Defendants Gaines and Smith are entitled to summary judgment on the merits, the Court need not address their qualified immunity argument. Scott v. Harris, 550 U.S. 372, 377 (2007); Martinez v. Burns, 459 F. App'x 849, 851 n.2 (11th Cir. 2012) (per curiam).

## IV.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motion for summary judgment be **DENIED**, (doc. no. 87), the motion for summary judgment by Defendants Clements, Davis, and Young (collectively "Mental Health Defendants") be **DENIED**, (doc. no. 93), and the motion for summary judgment by Defendants Gaines, Harvey, Philbin, Shelton, and Smith (collectively "Prison Official Defendants") be **DENIED** as to Defendants Philbin, Shelton, and Harvey, and **GRANTED** as to Defendants Gaines and Smith, (doc. no. 102). Should the presiding District Judge adopt this recommendation, this case shall proceed to trial in due course against Defendants Clements, Davis, Young, Philbin, Harvey, and Shelton.

SO REPORTED AND RECOMMENDED this 20th day of February, 2024, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA